744 A.2d 233

STATE IN THE INTEREST OF K.O., JUVENILE–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 30, 1999—Decided January 31, 2000.

558

Before Judges SKILLMAN, D'ANNUNZIO and NEWMAN.

*Catherine M. Brown* argued the cause for appellants J.O. and K.O.[1]

*Alyssa Aiello*, Assistant Deputy Public Defender, argued the cause for juvenile respondent (*Ivelisse Torres*, Public Defender, attorney; *Ms. Aiello*, on the brief).

*Pamela Adams Doughterty*, Assistant Prosecutor, argued the cause for respondent State of New Jersey (*John B. Dangler*, Morris County Prosecutor, attorney; *Angela M. Rich*, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

J.O. and K.O., the parents of K.O. (hereinafter referred to as "the parents"), appeal from the orders of September 3 and 14, 1999, extending K.O.'s term of probation entered by the Family Court judge arising out of a juvenile delinquency adjudication. The parents also appeal from paragraph three of the order of August 6, 1999, requiring the parents "to contact Jennifer Smed-

---

[1] K.O. (appellant) is actually the mother of the juvenile K.O.

burg at [Juvenile Evaluation and Treatment Services (JETS)] to arrange for whatever meetings or counseling is recommended as a first step toward joint counseling sessions and ultimate reunification." We affirm.

The history leading up to the entry of the orders being appealed from is lengthy, but is necessary to place the issues raised in context. In May 1998, K.O., a fifteen-year-old juvenile, was arrested and charged with possession of heroin. On August 19, 1998, K.O. appeared before Judge Friend and pled guilty to the charge. She was adjudicated delinquent and placed on probation for one year. The following "conditions of disposition" were also ordered: house arrest; obey custodian; attend school daily; obtain part-time employment; no association with co-defendant; driver's license suspended for six months upon turning seventeen; perform forty hours of community service; pay a $1000 DEDR penalty and a $30 VCCB penalty; and complete JETS evaluation and follow recommendations.

On October 12, 1998, JETS evaluated K.O. and recommended that she continue drug treatment, submit to weekly urinalysis, and that her parents become involved in her treatment.

On February 7, 1999, K.O. attempted to sneak out of her home with the aid of a friend who provided a ladder for K.O. to use. When K.O.'s father went to investigate, he found her bedroom door to be locked. According to K.O.'s father, when K.O. refused to unlock the door, he forced the door open, and the door struck K.O., giving her a bruise to the eye and a bloody nose. According to K.O., however, her father broke through the locked door and "smashed her head against the wall and floor, causing a blackened eye and [a] bloody nose."

On February 16, 1999, a student counselor at K.O.'s high school noticed the bruise on K.O.'s eye and told K.O. to contact the Department of Youth and Family Services (DYFS). Although DYFS could not substantiate K.O.'s claim of abuse, it found that "the risk of violence in the home between father and [K.O.] is high." DYFS recommended that K.O. be placed in a shelter "for

her own protection" and that she be evaluated by JETS. K.O. did not return home on February 16, 1999, and, with the consent of her mother, spent the following night at a friend's house. According to DYFS, K.O.'s family refused to allow her back into the home, and K.O. refused to return home.

On February 22, 1999, K.O.'s probation officer filed a complaint alleging that K.O. had violated her probation by failing to attend several classes at her vocational school and by remaining away from home on February 16, 1999. K.O. pled not guilty to this alleged violation of probation. The court remanded K.O. to a local shelter and ordered another JETS evaluation. The court also stated that K.O. and her parents were to "cooperate with any and all therapy ordered."

After evaluating K.O., JETS recommended that K.O. participate in weekly outpatient therapy; that the caregiver with whom K.O. is placed attend counseling with K.O.; that K.O. enter into a home contract with her future caregiver; and that the court address K.O.'s parents' refusal to provide consent for medical treatment of K.O.

On March 18, 1999, a review was conducted before Judge Susan Scott, discussing possible placement for K.O. K.O.'s assigned attorney from the Public Defender's Office indicated that there were a number of concerns regarding K.O.'s parents; namely, they did not participate in K.O.'s JETS evaluation, they refused to sign consents for emergency medical treatment of K.O. or for K.O. to attend any therapy, and they refused to assume financial responsibility for K.O.

On April 26, 1999, K.O. appeared before Judge Scott and pled guilty to violating her probation by failing to attend several classes at her vocational school and by remaining away from home on February 16, 1999. K.O.'s probation was continued, and she was released to the custody of P.A.W., the mother of one of K.O.'s friends. P.A.W. was present in court and indicated that she wished to take custody of K.O. She was approved by DYFS, the prosecutor, the court, and K.O. The court ordered that K.O.

cooperate with the terms of the home contract prepared by her youth shelter counselor and that she follow the recommendations of JETS.

K.O.'s parents were not present at the hearing despite the fact that they were notified that they had to be present. K.O.'s attorney stated that K.O.'s parents "have basically refused to be involved." A bench warrant was issued for K.O.'s parents to be executed on April 26 or 27, 1999 or May 5, 1999 and thereafter, and only during court hours.

On May 5, 1999, K.O. and her attorney and K.O.'s mother appeared before Judge Scott. The judge indicated that the reason for the appearance was "there were numerous prior proceedings in which the parents were required to attend and they did not attend; and at the last review, a request was made for an arrest warrant in order to get the parents to appear." Initially, K.O.'s mother stated that she had not appeared on prior occasions because, although she had received a letter from K.O.'s probation officer, she had never received any "summons" to appear in court. When asked again why she had not "been involved with any of the reviews or the proceedings involving [K.O.,]" K.O.'s mother responded:

> Because [K.O. is] looking to get herself out of the house. [K.O. is] running around crazy.... I mean, I just want her to wake up. I don't want to go through any more therapy. I've had therapies [sic]. I've had psychologists. I've had psychiatrists. She needs to have something put in her face that she has to grow up now.

The judge answered that "it's very hard for juveniles to get back on the right track without parental cooperation."

Judge Scott told K.O.'s mother that, as natural parents, she and her husband have an "obligation" to be involved. The judge stated further that K.O. "will remain in the custody of [P.A.W.], as long as she consents and as long as that's working out, unless and until [her parents] make an application" objecting to K.O.'s placement. Judge Scott continued:

> [If] you have reason to think [K.O. is] better someplace else, then present the court with whatever information, then we'd have a hearing and review that. But without

the parents' participation and cooperation, the Division of Youth and Family Services and the various other agencies involved make investigations and do what they think is best for the child. It's without parental input. They have to go with what their investigation suggests.

K.O.'s mother was released upon the condition that she attend all future court hearings and provide any requested information. Upon K.O.'s mother's suggestion, the court requested that DYFS follow up on the possible placement of K.O. with her aunt. Judge Scott concluded the proceedings by telling K.O.'s mother, "The problem is, when you bring children into the world, that even if they're a problem, you can't just wash your hands. You [have] got to try to cooperate with all [of] the support agencies and see it through."

On May 12, 1999, K.O.'s father was brought before Judge Scott. He was told that his presence was required at any court review involving K.O., and he agreed to be present at any future hearing.

On June 22, 1999, the parents moved for a modification of the court's order of April 26, 1999, requesting, among other things, that K.O. be placed back in their home and that her probation be extended. On July 23, 1999, the parties appeared before Judge Scott. The judge denied, without prejudice, the parents' request and ordered that the parents participate in counseling with a view toward family reunification. Judge Scott stated that she would not order that K.O. be placed back with her parents against the recommendation of a professional who was dealing with K.O. who thought that was not in K.O.'s best interest at that time. The judge said that "[t]he goal is reunification[,]" and that the judge needed "more than a court application from the parents in light of the history of this matter to convince [her] that it's in the best interests of the child to bounce her back at this point." The judge continued:

[T]he fact that [K.O.'s parents] are interested and want to get involved certainly is a major first step, and I think that the counseling and working toward some reunification is the major second step, and I'm certainly going to provide for that.

The parents argued that "the State's ability to regulate or interfere with [the family] relationship is limited and coupled with

an even greater adherence to procedural due process." Judge Scott disagreed, stating that the overriding consideration was the best interests of the child. The parents immediately requested a stay of the judge's order. The judge denied their request, stating that a stay of the order would result in an immediate transfer of custody because the judge's order "is just keeping things the way they are."

On August 6, 1999, the parents moved for reconsideration of the court's order denying their motion to change K.O.'s placement. The parents argued that, since K.O. had been placed with P.A.W., she was absent from school six days, late twelve days, and under disciplinary detention another four or five days. Judge Scott decided that, on the basis of what was presented to her, she did not "see anything that warrant[ed] removal from the current situation. . . ." The judge stressed that her decision did not mean that K.O.'s current custodial situation would be indefinite. The judge also required that an investigation be made regarding conflicting absentee records previously presented to the court.

The order denying the parents' application was entered on August 6, 1999. Paragraph three of the order required that the parents "contact Jennifer Smedburg at JETS to arrange for whatever meetings or counseling is recommended as a first step toward joint counseling sessions and ultimate reunification[.]"

On September 3, 1999, the parties again appeared before Judge Scott. The parents objected to extending K.O.'s probation until her fines were paid off. K.O. herself had consented with the advice of counsel to the extension of probation. The parents contended that, under *N.J.S.A.* 2A:4A–47c, upon the termination of an order of disposition, "the balance of the fine can be reduced to a judgment recorded as a priority lien." The parents also challenged the court's retention of jurisdiction, arguing that the disposition order, entered on August 19, 1998, for a one-year probationary term, "terminated by its terms because the probation term was never extended during the probation period."

Judge Scott indicated that it was her understanding that the disposition order required that certain conditions be met. Because those conditions had not been met, the judge considered the court to have two options; namely, finding the juvenile in violation of probation and imposing the necessary penalties or extending the probationary term. The judge explained that, in cases like this one, in which the juvenile is working with the system, probation chooses to "give her a break and do what's best for everybody and extend the probation." The parents countered that, while that "may be the practice in Morris County," such was not provided for in the statute.

By an order dated September 3, 1999, Judge Scott modified the original disposition order and extended K.O.'s probation to August 28, 2000, her eighteenth birthday, or until fines were paid in full.

On September 9, 1999, after paying K.O.'s fines, the parents moved for a termination of K.O.'s probation before Judge Scott. The judge spoke at length with K.O. to determine what K.O. thought was in her best interests, staying with P.A.W. or returning home. K.O. questioned her parents' motives behind paying her fines and indicated that she was doing "absolutely great" with P.A.W. K.O. did not think that returning home to live with her parents would "work." K.O. explained that she had not spoken to her parents or had much contact with any member of her family for some time. K.O. also stated that she wished to attend P.A.C.E., an alternative high school which is located within walking distance of P.A.W.'s house.

Judge Scott stated, "I haven't seen anything from the parents which gives me any comfort that they are able to determine what the best interests of the child are and follow through." The judge retained jurisdiction, finding that the court had jurisdiction based on the "existing status and the lack of complete compliance with prior orders[.]"

On appeal, the parents raise the following points for our consideration.

POINT I

ONCE THE PROBATION TERM IMPOSED BY THE ORIGINAL DISPOSI-
TION ORDER IS SERVED, THE TRIAL COURT HAS NO JURISDICTION
OVER THE ACTION, UNLESS A PROBATION VIOLATION COMPLAINT,
FILED ON NOTICE TO THE PROSECUTOR DURING THE PROBATION-
ARY TERM, IS PENDING.

POINT II

MR. AND MRS. ["O"] WERE DENIED PROCEDURAL DUE PROCESS ONCE
THE FOCUS OF THE DELINQUENCY PROCEEDING SHIFTED FROM
THEIR DAUGHTER'S CONDUCT TO THEIR CONDUCT.

We address the arguments in the order raised.

*I.*

The parents contend that the trial court was without jurisdiction
to extend K.O.'s probation "after the probation term expired on
August 19, 1999[.]"

As an initial matter, K.O. argues that her parents do not
have standing to challenge the court's order extending her proba-
tion. According to K.O., her parents "have failed to demonstrate
that they were aggrieved by the lower court's order extending
[her] probation." We disagree.

Parents, as the guardians of their children, have standing to be
heard. In *D.Y.F.S. v. D.T.*, 171 *N.J.Super.* 520, 526, 410 *A.*2d 79
(J. & D.R. Ct.1979), the court recognized that "foster parents
should have standing in court on matters affecting their foster
children." We would not afford foster parents greater opportuni-
ty to be heard on matters relating to their foster children than we
would biological parents on matters relating to their biological
children. We, therefore, will address the parents' challenge to the
continuation of their daughter's probation.

In challenging the Family Court's jurisdiction, the parents
argue that the court lost jurisdiction once the probationary term
of one year expired; the court could not extend the term of
probation because it did not follow the guidelines set forth in
*N.J.S.A.* 2A:4A–45; and the double jeopardy clauses of the state
and federal constitutions prohibited the extension of K.O.'s proba-

tionary period because the extension was not based on a violation of probation.

### A.

N.J.S.A. 2A:4A–47a provides that an order of disposition entered in a juvenile delinquency case "shall terminate when the juvenile who is the subject of the order attains the age of 18, or three years from the date of the order whichever is later unless such order ... is sooner terminated by its terms or by order of the court." The disposition order in this case was entered on August 19, 1998, and, by its terms, the length of the probationary term imposed was one year.

With regard to jurisdiction, N.J.S.A. 2A:4A–45b provides:

> Except as provided for in subsection a., the court shall retain jurisdiction over any case in which it has entered a disposition under [2A:4A–43] and may at any time for the duration of that disposition, if after hearing, and notice to the prosecuting attorney, it finds violation of the conditions of the order of disposition, substitute any other disposition which it might have made originally.

All parties agree that the disposition in this case was entered under N.J.S.A. 2A:4A–43. The parents argue, however, that, under N.J.S.A. 2A:4A–45, once the probationary term of one year expired, the court lost its jurisdiction. We disagree.[2]

N.J.S.A. 2A:4A–43 provides an expansive array of dispositions for a juvenile adjudicated delinquent. In determining an appropriate disposition, the court had to weigh the following factors:

(1) The nature and circumstances of the offense;

(2) The degree of injury to persons or damage to property caused by the juvenile's offense;

(3) The juvenile's age, previous record, prior social service received and out-of-home placement history;

---

[2] There is a reference in the record that Judge Scott was on vacation when the order extending probation was presented, and therefore, she was not available to sign the extension within the one-year probation period initially imposed. Because we are convinced of the court's jurisdiction on other grounds, we have not remanded to develop the record on this alternate ground.

(4) Whether the disposition supports family strength, responsibility and unity and the well-being and physical safety of the juvenile;

(5) Whether the disposition provides for reasonable participation by the child's parent, guardian, or custodian, provided, however, that the failure of a parent or parents to cooperate in the disposition shall not be weighed against the juvenile in arriving at an appropriate disposition;

(6) Whether the disposition recognizes and treats unique physical, psychological and social characteristics and needs of the child;

(7) Whether the disposition contributes to the developmental needs of the child, including the academic and social needs of the child where the child has mental retardation or learning disabilities; and

(8) Any other circumstances related to the offense and the juvenile's social history as deemed appropriate by the court.

[*N.J.S.A.* 2A:4A–43a.]

It is obvious from the factors which the court must consider that the juvenile is not divorced from his or her family in formulating the appropriate disposition. To the contrary, the family is an integral part of the process.

The goal of the juvenile law is to rehabilitate the delinquent. *N.J.S.A.* 2A:4A–21b. While the juvenile law seeks to "preserve the unity of the family whenever possible[,]" *N.J.S.A.* 2A:4A–21a, it will not hesitate to separate juveniles from their own families when necessary for their safety. *N.J.S.A.* 2A:4A–21c. Because friction can develop between the juvenile and his or her own parents in this fragile period of adolescence, especially where drug use may be involved, the court is equipped with the widest array of dispositional tools to fulfill the goals set forth in the Code of Juvenile Justice. *N.J.S.A.* 2A:4A–21 and –43b.

In response to the problems of K.O. and her parents, the court developed a comprehensive treatment plan designed to rehabilitate K.O. and reunite her with her family. Probation was a part of this plan, but was not the only element involved. Under *N.J.S.A.* 2A:4A–43b, the court may order one or more of twenty dispositions, including

(3) Plac[ing] the juvenile on probation to the chief probation officer of the county or to any other suitable person who agrees to accept the duty of probation supervision for a period not to exceed three years upon such written conditions as the court deems will aid rehabilitation of the juvenile;

(4) Transfer[ing] custody of the juvenile to any relative or other person determined by the court to be qualified to care for the juvenile; .

. . . .

(14) Plac[ing] the juvenile in a suitable residential or nonresidential program for the treatment of alcohol or narcotic abuse, provided that the juvenile has been determined to be in need of such services;

(15) Order[ing] the parent or guardian of the juvenile to participate in appropriate programs or services when the court has found either that such person's omission or conduct was a significant contributing factor towards the commission of the delinquent act, or, under its authority to enforce litigant's rights, that such person's omission or conduct has been a significant contributing factor towards the ineffective implementation of a court order previously entered in relation to the juvenile;

. . . .

(18) Order[ing] that the juvenile satisfy any other conditions related to the rehabilitation of the juvenile[.]

The Family Court also has broad jurisdictional power over any disposition it imposes. *N.J.S.A.* 2A:4A–43 and –45. Under *N.J.S.A.* 2A:4A–24a, the Family Court has "exclusive jurisdiction in all cases where it is charged that a juvenile has committed an act of delinquency[.]" Such jurisdiction extends not only over the juvenile but also over his or her "parent, guardian, or any family member found by the court to be contributing to a juvenile-family crisis." *N.J.S.A.* 2A:4A–24a.

Indeed, when K.O. pled guilty to violating her probation, the Family Court fashioned a rehabilitation treatment plan with a number of conditions, including: continued probation; release to P.A.W.; comply with home contract; and follow recommendation of JETS. JETS recommended that K.O. return to the drug counseling program at Group Therapy Alliance or, in the alternative, enroll in the aftercare program at Day Top Outreach.

Moreover, K.O.'s placement with P.A.W. and participation in drug counseling were not enumerated as express conditions of probation. The order of April 26, 1999, does not include this placement and rehabilitative treatment alternative as conditions of probation as opposed to separate dispositions.

Under *N.J.S.A.* 2A:4A–43b, the Family Court had the authority to order placement, compliance with a home contract, and participation in drug counseling as separate dispositions. The April 26,

1999 order contains a number of provisions which were not conditions of K.O.'s probation. The order also provided that DYFS remain in the case and that a bench warrant for K.O.'s parents be issued.

Thus, the placement of K.O. with P.A.W. was sufficient, without more, to enable the court to retain its jurisdiction, which was part of the adaptability of the Family Court to accommodate to the ebbs and flows of the juvenile's adjustment while under the court's jurisdiction. Even if the court did not extend the probation within the one-year period that was initially imposed, the court still retained its jurisdiction through the other dispositions that were very much in force and effect.

Here, the court could have initially imposed a maximum term of probation until K.O. attained the age of eighteen, or three years from the date of the order whichever is later. *N.J.S.A.* 2A:4A–47a. Since the initial probation was for one year, the court still had the legal authority to impose an additional two years of probationary time upon an appropriate showing of cause or consent, which would run beyond the date upon which the juvenile became eighteen, August 28, 2000. Judge Scott, however, limited the period until the juvenile turned eighteen.

*B.*

The parents also contend that the court could not extend the term of probation because it did not hold a hearing and provide notice to the prosecuting attorney as set forth in *N.J.S.A.* 2A:4A–45b. The court was relieved of the obligation to do so because the juvenile consented with the advice of counsel to the extension of probation. It therefore would be unnecessary to follow the procedure laid out in *N.J.S.A.* 2A:4A–45b when the juvenile willingly agreed to continued monitoring under probation.

Moreover, the extension of the probationary period was ancillary to the juvenile's placement outside of the family. The Family Court would be in a better position to track the juvenile's progress if probation was still in place while the juvenile was living

outside of the family environment. The Family Court has an obligation to insure that a juvenile adjudicated delinquent will receive effective rehabilitation treatment, one of the primary goals of the Code. *In re D.F.*, 138 *N.J.Super.* 383, 390, 351 *A.*2d 43 (J. & Dr. Ct.1975), *certif. denied*, 74 *N.J.* 260, 377 *A.*2d 665 (1977).

In *State v. S.T.*, 254 *N.J.Super.* 1, 4, 603 *A.*2d 39 (App.Div.1991), we held that the Family Part retains jurisdiction to impose sanctions for probation violations after the expiration of the jurisdictional period prescribed by *N.J.S.A.* 2A:4A–47. We said:

> [T]he interpretation of [*N.J.S.A.* 2A:4A–45] rendered by the Family Part judge leaves the court system powerless to insure compliance by juvenile offenders with the provisions or conditions of an order of disposition entered pursuant to the Code of Juvenile Justice where the juvenile is eighteen years of age and his term of probation is at or near its end. The Legislature could not have intended such an absurd result.
>
> [*Ibid.*]

We then made reference to *In re Smigelski*, 30 *N.J.* 513, 521–22, 154 *A.*2d 1 (1959), in which the Court stressed:

> Our statutes make it clear that the Legislature did not intend the jurisdiction of the juvenile court to be terminated or turned off like a faucet the moment a person who has committed an offense attains his 18th birthday, or that that event would necessarily preclude the acquisition and exercise of jurisdiction thereafter.
>
> [*S.T.*, *supra*, 254 *N.J.Super.* at 4, 603 *A.*2d 39.]

If the court could exercise its jurisdiction over a juvenile more than eighteen years old, it certainly should not lose its jurisdiction over a juvenile who is under the age of eighteen. If, upon the expiration of the probationary term, the conditions of disposition have not been satisfied, and the juvenile is in need of continuing treatment or rehabilitation, it runs counter to the entire philosophy of the Family Court that the court would be without jurisdiction to help the juvenile by extending her probation. We, therefore, conclude that the Family Court retained jurisdiction after the expiration of the probationary term to extend that probationary term with the consent of the juvenile for the purpose of insuring compliance with the conditions of its disposition order and to promote the rehabilitation of the juvenile.

## C.

The parents argue that the double jeopardy clauses of the state and federal constitutions prohibit an extension of a probationary period not based on a violation of probation. The parents also recognize that their daughter consented with the advice of counsel to the extension of the probation. The challenge to their daughter's consent is meritless. While the parents may have standing to challenge the jurisdictional aspect of the extension of probation, they lack standing to raise the double jeopardy bar argument. *See In re Quinlan,* 70 *N.J.* 10, 34, 355 *A.*2d 647, *cert. denied,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976) (stating that, generally, litigants may not assert the constitutional rights of another).

## II.

The parents argue in Point II that, even if the court had jurisdiction, the orders of September 3 and 14, 1999, and paragraph three of the August 6, 1999 order, must be vacated because the focus of the delinquency proceeding improperly shifted from K.O.'s conduct to their conduct; they were denied fundamental due process; and the court improperly applied the best interests standard in the context of a delinquency matter.

## A.

The parents assert that "once the basis for the court's orders was the conduct of the parents ... the parents were entitled to a hearing, after notice and other appropriate safeguards, *before* their child was removed from their custody." According to the parents, K.O. was placed in the custody of P.A.W. because of their conduct, and the court has continued that placement based on their conduct.

The parents contend that the Legislature "has created several causes of action that authorize the removal of a child from a parent because of the parents conduct[,]" namely, "termination, abuse and neglect, and family and crisis." They maintain that the

court should have afforded them the procedural safeguards "set forth in these causes of action[.]"

The court, in placing K.O. in the custody of P.A.W. and in ordering that K.O. remain in P.A.W.'s custody, was not acting under any of these statutes. Rather, the court was acting pursuant to *N.J.S.A.* 2A:4A–43 of the Code of Juvenile Justice. That statute specifically authorizes the court to "[t]ransfer custody of the juvenile to any relative or other person determined by the court to be qualified to care for the juvenile[.]" *N.J.S.A.* 2A:4A–43b(4).

■ Furthermore, to the extent that the parents rely on the criteria that must be met before parental rights may be terminated, this was not a proceeding to terminate parental rights. The termination of parental rights, in contrast to the loss of custody, permanently ends the relationship between biological parents and their children. *In re Adoption of L.A.S.*, 134 *N.J.* 127, 132, 631 *A.*2d 928 (1993). In fact, the court's order of August 6, 1999, was crafted to promote reunification of parent and child, the exact opposite of termination of parental rights.

### B.

■ The parents maintain that the court's April 26, 1999 order transferring custody to P.A.W. violated their constitutional rights to due process. They argue that the State failed to put them "on notice and afford them constitutionally adequate procedure before the placement occurred." The parents also argue that the court was not impartial in making its determinations. They contend that "[t]he State's unfortunate misguided handling of K.O.'s probation supervision resulted in a gross violation of the [parents'] right to procedural due process." We find no basis to support the parents' arguments.

The parents were given notice of the proceedings and told that they were required to attend. In order to insure their attendance at the proceedings and to hear their version of the events, the court issued bench warrants for their arrest, to be executed only

during court hours. The parents' claim that they were denied the opportunity to be heard is moot. Since April 26, 1999, the parents have appeared at three hearings and had the opportunity to voice their objection to K.O.'s placement and request that K.O. be returned to their custody. Furthermore, the purported violation of the parents' due process rights by the April 26, 1999 order has no bearing on the August 6, 1999 order which is the subject of this appeal.

## C.

The parents contend that the trial court "misapplied the best interests standard when ordering the continued placement of K.O. outside the family home."

"When a court determines it likely that a juvenile has committed an offense, the juvenile is then subject to the parens patriae jurisdiction of the State." *In re S.T.*, 273 *N.J.Super.* 436, 448, 642 *A.*2d 422 (App.Div.1994). This is evidenced by *N.J.S.A.* 2A:4A–24c, which states: "Juveniles who appear before the court in any capacity shall be deemed to be wards of the court and protected accordingly." "A court's disposition of a juvenile matter is meant to protect the juvenile," and this may be accomplished by separating the juvenile from his or her family environment when necessary for the juvenile's health, safety, or welfare. *In re S.T.*, *supra*, 273 *N.J.Super.* at 448, 642 *A.*2d 422; *N.J.S.A.* 2A:4A–21c.

Prior to the placement of K.O. in P.A.W.'s custody, DYFS had determined that "the risk of violence in the home between father and [K.O.] is high," and recommended that K.O. be placed in a shelter "for her own protection." Judge Scott considered the recommendation of a professional who was dealing with K.O. who thought that it was not in K.O.'s best interest to return home at that time. The judge also heard argument from the parents; spoke with K.O. personally; and inquired as to K.O.'s progress since her placement with P.A.W. Additionally, the record discloses that the parents refused to allow K.O. back into the home as of February 18, 1999; the parents refused to appear at hearings

relating to K.O. and disputed court notice that their attendance was required; the parents made little or no attempt to contact K.O. when she was at the shelter or since she has been in P.A.W.'s custody; and the parents have not participated or made attempts to participate in court ordered counseling aimed at reunification.

The Family Court has the authority to order the parent of a delinquent child to attend counseling. *N.J.S.A.* 2A:4A–43b(15). The imposition of family counseling was deemed to be in the best interest of K.O. As of August 6, 1999, the court did not have reason to believe that the immediate reunification of K.O.'s family was in K.O.'s best interest. In the time between DYFS's findings in February 1999 and the parent's July 23, 1999 motion for return of custody, nothing occurred to indicate that K.O.'s relationship with her parents had lost its volatility. The court had no reasonable basis to conclude on the record before it that the situation was ripe for family reunification.

Lastly, while the parents appeal from paragraph three of the court's order of August 6, 1999, requiring them "to contact Jennifer Smedburg at JETS to arrange for whatever meetings or counseling is recommended," they have not presented an argument why this order was in error other than to state that it is unenforceable.

 Pursuant to *N.J.S.A.* 2A:4A–43 the Family Court judge can require that parents or guardians participate in counseling, therapy, substantive abuse programs, "or any other reasonable programs designed to correct family dysfunction." *State v. H.B.,* 259 *N.J.Super.* 603, 607, 614 *A.2d* 1081 (Ch.Div.1992) (citing *N.J.S.A.* 2A:4A–43b(4) and (15)). "In New Jersey the emphasis is on the family, rather than the juvenile, in developing a total rehabilitative plan." *Ibid.* The court acted within its power in ordering that K.O. and her parents attend counseling sessions. The court's express purpose in doing so was the ultimate reunification of K.O. and her parents, a goal for which the parents claim they are striving.

Affirmed.