842 A.2d 904

STATE OF NEW JERSEY IN THE INTEREST OF S.S.

Superior Court of New Jersey
Appellate Division

Submitted December 17, 2003—Decided March 10, 2004.

Before Judges CONLEY, CARCHMAN and WECKER.

*Yvonne Smith Segars,* Public Defender, attorney for appellant (*Kevin G. Byrnes,* Designated Counsel, on the brief).

*Vincent P. Sarubbi,* Camden County Prosecutor, attorney for respondent (*Jack L. Weinberg,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

The question raised by this appeal is whether a juvenile, who originally came before the court solely on account of a juvenile-family crisis petition, may be adjudicated delinquent for violating a court order to "obey the rules" of home and school. We now answer that question in the negative and reverse the order adjudicating S.S. delinquent for contempt of court, a fourth-degree offense under *N.J.S.A.* 2C:29–9 if committed by an adult. In so doing, we overrule *State in the Interest of J.S.,* 266 *N.J.Super.* 423, 629 *A.*2d 1371 (Ch.Div.1993).

Truancy and running away from home are known as "status offenses," [1] which are by definition uniquely applicable to a minor. They would not be crimes if committed by an adult. Such conduct apparently brought S.S. and her family within the court's "crisis" jurisdiction in the first place.

The thrust of our decision is that it is contrary to the legislative intent expressed in the New Jersey Code of Juvenile Justice, and unjustified under existing statutory and common law, for a juvenile status offender to be adjudicated delinquent on account of *N.J.S.A.* 2C:29–9 without having committed any other act prohibited by the Code of Criminal Justice. Such an adjudication has been described as "bootstrapping." *See, e.g.,* Levesque and Tomkins, *supra,* 9 *Psychol. Pub. Pol'y & L.* at 240; Maggie L.

---

[1] Juveniles who are chronic runaways or truants are frequently referred to as "status offenders." *See, e.g.,* Roger J.R. Levesque & Alan J. Tomkins, Bruce J. Winck, Ken Kress, Jan C. Costello, *"Wayward and Noncompliant" People with Mental Disabilities—What Advocates of Involuntary Outpatient Commitment can Learn from the Juvenile Court Experience with Status Offense Jurisdiction,* 9 *Psychol. Pub. Pol'y & L.* 233, 237–38 (2003) (Levesque and Tomkins) (summarizing the history of juvenile court jurisdiction over status offenders).

Hughey, *Holding a Child in Contempt,* 46 *Duke L.J.* 353, 377–78 (1996).

S.S. (born January 16, 1986) and her family originally came to the court's attention on August 23, 2001, on the complaint of S.S.'s parents that she was staying out late and running away. A juvenile-family crisis petition was filed pursuant to *N.J.S.A.* 2A:4A–83. S.S. was released to her parents with referrals for counseling and a curfew. In March 2002, the family returned to the court with similar complaints by the parents. A referral to the Division of Youth and Family Services (DYFS) was made, and on March 14, 2002 the Family Part judge issued the order that formed the basis for the contempt charge at issue.

The March 14 order included preliminary findings that S.S. "failed to obey Rules of Home and Rules of School [and] that these problems continue despite effects [sic] of Parents, School, and this Court [and] a need to enter this ORDER to have [S.S.] comply with rules of home and school and to cooperate with treatment." The Order explicitly required that S.S. "obey all Rules of Home, Rules of School and must attend counseling sessions" on two specific dates. The order also included a provision that proof of its violation would result in a criminal contempt complaint pursuant to *N.J.S.A.* 2C:29–9a. S.S. signed an acknowledgement of the terms of the order, including: "I understand that a single violation of a rule of Home, School, or a single failure to cooperate with treatment is the only act necessary for the filing of a Criminal Contempt charge."

On May 7, 2002 the judge ordered psychological and psychiatric evaluations.[2] On May 22, a complaint by S.S.'s parents led to a juvenile delinquency complaint signed by a member of the Pennsauken Police Department, charging S.S. with contempt under *N.J.S.A.* 2C:29–9a for "failing to come home on 5–20–02 contrary to . . . the order [of March 14, 2002]." The complaint came before

---

[2] The record does not reveal a psychiatric evaluation, or any evaluation of S.S.'s parents or the parent-child relationship.

the Family Part judge on June 18, 2002. Based upon a stipulation that S.S. in fact had not come home on May 20, the judge found S.S. in contempt of court and adjudicated her delinquent. Thereafter, on June 25, S.S. herself told the judge:

> Yeah, I'm okay. Since I'm doing really good in the YES Program, I would like to be in the YES Program. Since I'm having no violation, I'm making it good there.

The judge placed S.S. in the custody of DYFS and approved her continuing placement in a Youth Empowerment Services (Y.E.S.) facility.[3] On July 30, 2002, the judge imposed a two-year probationary term, with the following conditions:

> that she cooperate with the placement that the Division has undertaken to date, and to continue to cooperate with them, attending all counseling sessions, that [S.S.] follow up and attend school as to be developed for her by the Division and the Division representatives. [S.S.] obviously needs to obey the rules in any school that she's in, and when she's home, she should also obey the rules there, without drugs, alcohol or other arrests.

The factual record before us is meager. These are the facts we glean from the Juvenile Pre–Disposition Report. S.S. was the oldest of four children residing with their married parents. Her siblings were a fifteen-year-old sister, a fourteen-year-old brother, and a four-year-old brother. The family lived in a large house in Pennsauken, and one of S.S.'s grandmothers lived with the family. S.S.'s parents, who are described as immigrants, owned an ethnic restaurant. S.S. had no medical problems. However, a psychological evaluation completed on April 30, 2002 at the court's request led to a report by Dr. Martin Richter, Ed.D.

Dr. Richter described S.S. as "pleasant, cooperative and talkative." She reported running away from home once in 2001 and twice in 2002, "in order to be with her friends in Philadelphia." She reported that her parents "hit her with a belt or a coat hanger when she talks back to them or when she will not do what they want her to do [and] this started when she would leave the house to be with her friends." She denied that they mistreated her before she ran away, and said she loved them. She also reported

---

[3] Y.E.S. is a residential program serving the courts and the Division of Youth and Family Services.

frequent consensual sex with several partners and claimed she had sex to "get back" at her parents. S.S. told Dr. Richter that she had been depressed for more than a year, "always keeps her feelings inside and that nobody in her family has any idea of her feelings." She also reported sometimes fighting with her parents all day.

Dr. Richter's testing revealed an IQ of 87, which he described as "an under estimation of [her] intellectual potential." The doctor's recommendations for S.S. were:

1. Antidepressant medication should be considered for [S.S.]. She has had a long-term depression that is unlikely to be responsive to psychotherapy alone.

2. [S.S.] was verbal and forthcoming during the interview portion of the evaluation. She appears amenable to individual psychotherapy.

3. [S.S.] should have access to group psychotherapy. She feels isolated from her peers, but she desires social interaction.

4. If [S.S.] is placed in a residential program, it should be physically close enough for her family to participate in the program and aftercare.

Thus the record reveals a depressed and unhappy sixteen-year-old who repeatedly ran away from home and failed to attend school, who appeared to need and be amenable to individual and group therapy, and possibly to require anti-depressive medication.

At the outset, we note that S.S. does not challenge her placement in the Y.E.S. program, but only the adjudication of delinquency. S.S. was not placed in a secure detention facility where adjudicated delinquents, or juveniles facing charges that could lead to an adjudication, are placed. Nonetheless, once adjudicated delinquent, she faced that risk.[4] She also acquired the label and the juvenile record that goes with an adjudication of delinquency.

---

4 At start of the hearing on the juvenile delinquency complaint, in response to counsel's challenge to the delinquency petition and suggestion of a residential placement, the judge raised precisely the threat of "prison":

And how long does that take? And how about when the child doesn't go to the residential placement? At least if I had a contempt available, I could explain to the juvenile you have a choice. You could go to prison or you could go to residential placement. And I would hope 100 of the time the child would choose residential placement. And quite honestly, in the last eight years, I have had 100 success. Because most people know that a

■ We begin our analysis by examining the relevant statutes, namely, *N.J.S.A.* 2C:29–9 and the Code of Juvenile Justice, *N.J.S.A.* 2A:4A–20 to –48. *N.J.S.A.* 2C:29–9a provides:

> A person is guilty of a crime of the fourth degree if he purposely or knowingly disobeys a judicial order or hinders, obstructs or impedes the effectuation of a judicial order or the exercise of jurisdiction over any person, thing or controversy by a court, administrative body or investigative entity.

The statute appears literally to apply to S.S.'s conduct. But [s]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' *Schierstead v. City of Brigantine,* 29 *N.J.* 220, 230, 148 *A.2d* 591 (1959) (quoting *Morris Canal and Banking Co. v. Cent. R.R. Co.,* 16 *N.J. Eq.* 419, 428 (Ch. 1863)). See *Lloyd v. Vermeulen,* 22 *N.J.* 200, 205, 125 *A.2d* 393 (1956), quoting Judge Learned Hand in *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (There is no surer way to misread any document than to read it literally.). We are further guided by the express instruction of the Supreme Court:

> It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms.
>
> [*New Capitol Bar Grill Corp. v. Div. of Employment Sec., Dep't of Labor and Indus.,* 25 *N.J.* 155, 160, 135 *A.2d* 465 (1957) (quoting *Alexander v. New Jersey Power Light Co.,* 21 *N.J.* 373, 378, 122 *A.2d* 339 (1956)).]

The express purposes of the Juvenile Justice Code are set forth at *N.J.S.A.* 2A:4A–21:

> This act shall be construed so as to effectuate the following purposes:
>
> a. To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of juveniles coming within the provisions of this act;
>
> b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation, and a range of sanctions designed to promote accountability and protect the public;

---

DYFS residential placement is a better place than prison. But they know if they push the gauntlet, then they could go to prison.

c. To separate juveniles from the family environment only when necessary for their health, safety or welfare or in the interests of public safety;

d. To secure for each child coming under the jurisdiction of the court such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the State; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents;

e. To insure that children under the jurisdiction of the court are wards of the State, subject to the discipline and entitled to the protection of the State, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them; and

f. Consistent with the protection of the public interest, to insure that any services and sanctions for juveniles provide balanced attention to the protection of the community, the imposition of accountability for offenses committed, fostering interaction and dialogue between the offender, victim and community and the development of competencies to enable children to become responsible and produc-tive members of the community.[ 5]

■ Even with respect to a juvenile charged with conduct that would be a crime if committed by an adult, the overriding goal of the juvenile justice system is rehabilitation, not punishment. *E.g., State in the Interest of K.O.,* 327 *N.J.Super.* 555, 570, 744 *A.*2d 233 (App.Div.2000); *State in the Interest of G.S.,* 330 *N.J.Super.* 383, 389–90, 749 *A.*2d 902 (Ch.Div.2000). A fortiori, the goal of the juvenile-family crisis jurisdiction is to assist the family—especially the juvenile—in resolving the problems that contributed to the juvenile's acting-out behaviors.

The Code of Juvenile Justice distinguishes juveniles found to be involved in a juvenile-family crisis from those juveniles found to be delinquent. A "juvenile-family crisis" is defined by *N.J.S.A.* 2A:4A–22g:

"Juvenile-family crisis" means behavior, conduct or a condition of a juvenile, parent or guardian or other family member which presents or results in (1) a serious threat to the well-being and physical safety of a juvenile, or (2) a serious conflict between a parent or guardian and a juvenile regarding rules of conduct which has been manifested by repeated disregard for lawful parental authority by a juvenile or misuse of lawful parental authority by a parent or guardian, or (3) unauthorized absence by a juvenile for more than 24 hours from his home, or (4) a pattern of

---

5 Section f became effective August 1, 2002. *L.* 2001, *c.* 408, § 1

repeated unauthorized absences from school by a juvenile subject to the compulsory education provision of the Title 18A of the New Jersey Statutes.

Delinquency, by contrast, is defined by *N.J.S.A.* 2A:4A-23:

> As used in this act, "delinquency" means the commission of an act by a juvenile which if committed by an adult would constitute:
>
> a. A crime;
>
> b. A disorderly persons offense or petty disorderly persons offense; or
>
> c. A violation of any other penal statute, ordinance or regulation.

Relevant sections of the Code expressing the intended distinctions include *N.J.S.A.* 2A:4A-37, providing for detention facilities to be specified by the Juvenile Justice Commission, but shelter facilities to be specified by the Department of Human Services; *N.J.S.A.* 2A:4A-46, limiting the dispositions available in a juvenile-family crisis situation; *N.J.S.A.* 2A:4A-70b, describing the responsibilities of a court intake service; *N.J.S.A.* 2A:4A-76, establishing juvenile-family crisis intervention units in each county; *N.J.S.A.* 2A:4A-86, describing the hearing to be afforded on a family crisis petition; and *N.J.S.A.* 2A:4A-87 and -88, describing available placements for such a juvenile. *N.J.S.A.* 2A:4A-88 prohibits placement of a juvenile who comes before the court under the family crisis jurisdiction in a secure detention or correctional facility for "juveniles accused of crimes or adjudged delinquent."

*N.J.S.A.* 2A:4A-87 expressly provides for placement of juveniles involved in family crisis:

> When, despite provision of crisis intervention services and the exhaustion of all alternative services, there is a refusal on the part of the juvenile to stay in or return to the home or a refusal on the part of the parents to allow the juvenile to stay in or return home, or the physical safety of the juvenile is threatened, or the juvenile is in need of immediate care such that it is necessary to make an out of home placement of the juvenile, court intake services shall:
>
> a. Arrange, when agreed to by the parent or guardian and juvenile, alternate living arrangement for the juvenile with a relative, neighbor, or other suitable family setting. It shall not be necessary for a court hearing to approve the living arrangement and the arrangement may continue as long as there is agreement; or
>
> b. Arrange, when no alternate living arrangement can be agreed to and when all possible resources for alternate living arrangements as set forth in subsection a. of this section have been exhausted, temporary out of home placement prior to the placement hearing. Court intake services shall immediately file a petition for out of home placement which shall include documentation of the attempts made to

provide alternate living arrangements including, but not limited to, the names of persons contacted, their responses and the lack of agreement by the juvenile or the juvenile's parents if the persons contacted are willing to take the juvenile with the court. The crisis intervention unit shall inform the juvenile and parent or guardian that an out of home placement determination may be made by the court where an alternate living arrangement cannot be agreed to.

The Legislative's concern for the well-being of juveniles involved in serious conflict with their family, with "repeated truancy and unauthorized absences from the family home" is apparent in the Senate Judiciary Committee Statement attached to the most recent amendment to *N.J.S.A.* 2A:4A–87.[6] With respect to enforcement of any order of disposition in a family crisis case, *N.J.S.A.* 2A:4A–86 provides, in pertinent part:

In the case of failure of any person to comply with any orders entered pursuant to this section [juvenile-family crisis statutes], the court *may proceed against such person for the enforcement of litigants' rights.*

[Emphasis added.]

That provision effectively directs the juvenile court to proceed pursuant to *R.* 1:10.[7] The omission of any reference to *N.J.S.A.*

---

[6] Under the New Jersey Code of the Juvenile crisis, the term "juvenile-family crisis" refers to behavior or conduct which results in a serious threat to the physical well-being of a juvenile; serious conflicts between a juvenile and his parents regarding conduct; repeated truancy and unauthorized absences from the family home. By law, each county has created a juvenile-family crisis intervention unit to respond to requests or referrals for assistance in dealing with juvenile-family crisis.

If after trying to resolve a juvenile-family crisis, the juvenile continues to refuse to return or stay home or his parents refuses to allow a juvenile to stay or return home, the crisis intervention unit is authorized to request the court intake services to petition the family court for an out of home placement of the juvenile. This bill would require that before a petition for out of home placement be filed that the crisis intervention unit exhaust all possible sources for alternate living arrangements (i.e. relatives; friends, etc.). The bill would also require that any petition for out of home placement contain documentation of the attempts made to provide alternate living arrangements.

The provisions of this bill are based on recommendations contained in the 1988 report of the Juvenile Delinquency Commission.

[Senate Judiciary Committee Statement, Senate Bill No. 3168, *L.* 1989, *c.* 305]

[7] *R.* 1:10–3 has been described as addressed to

2C:29–9, the criminal contempt statute, suggests that the Legislature did not intend enforcement by such means. Whatever the limitations of *R.* 1:10 for purposes of a juvenile-family crisis order, it is plain that criminal proceedings are not intended as a means of enforcement.

We note the apparent absence of investigation or examination into the conditions of the home and family that may have contributed to S.S.'s behavior and that may warrant stricter supervision or additional support from the crisis unit.[8] By way of example, we note that Dr. Richter's report includes the following:

> According to [S.S.], her parents hit her with a belt or a coat hanger when she talks back to them or when she will not do what they want her to do. She stated that this started when she would leave the house to be with her friends. Prior to that time, her parents would only hit her with their hands if she had done something wrong. [S.S.] wanted me to know that her parents did not mistreat her before the running away started. She talked about loving her parents, and she began to cry silently.

We do not suggest that there are easy answers to the problems facing the Family Part judge in a case such as this. We do note, however, the apparent availability of the county's court intake service, pursuant to *N.J.S.A.* 2A:4A–70b, to "assist the court in ... making referrals to appropriate agencies, reviewing and approving alternative living arrangements ... and in monitoring

---

a court's 'inherent right to invoke coercive measures designed to compel a recalcitrant party to comply with a court order.' *S.S. v. E.S.*, 243 *N.J.Super.* 1, 8, 578 *A.2d* 381 (App.Div.1990). *A proceeding to enforce litigant's rights 'is essentially a civil proceeding to coerce the defendant into compliance with the court's order for the benefit of the private litigant.* In such proceeding the judge, before ordering any sanction, must determine that defendant has the ability to comply with the order [that] he has violated \* \* \*.' *Essex County Welfare Bd. v. Perkins*, 133 *N.J.Super.* 189, 195, 336 *A.2d* 16 (App.Div.1975). [*Manalapan Realty, L.P. v. Township Committee of Manalapan*, 140 *N.J.* 366, 392, 658 *A.2d* 1230 (1995) (Stein, J., concurring in part and dissenting in part) (emphasis added).]

8 Commentators have noted the likelihood that conflict within the child's family is related to behavior problems that trigger status offenses. *E.g.*, Levesque & Tomkins at 237–38; Jan C. Costello & Nancy L. Worthington, *Incarcerating Status Offenders: Attempts to Circumvent the Juvenile Justice and Delinquency Prevention Act*, 16 *Harv. C.R.-C.L.L.Rev.* 41, 45–46 (1981).

referrals for development and implementation of family service plans." The statutory jurisdiction is not limited to the juvenile, but extends to her parents, as does the enforcement authority pursuant to *N.J.S.A.* 2A:4A–86 and *R.* 1:10.

The Court Rules pertaining to families in crisis reflect the statutory mandates. *See generally R.* 5:15 to 5:18. Specifically, with respect to enforcement of its orders, *R.* 5:17–3 provides that after the court finds that a juvenile-family crisis exists, and makes its disposition, then "in the event of the failure of any person to comply with a dispositional order, [the court] *may proceed against such person for the enforcement of litigant's rights.*" (Emphasis added). That rule adopts verbatim the language of *N.J.S.A.* 2A:4A–86, quoted above, and is consistent with our determination that proceeding under the criminal contempt statute, *N.J.S.A.* 2C:29–9, is not authorized in this case.

Our decision is informed by the Supreme Court's decision and reasoning in *State in the Interest of M.S.,* 73 *N.J.* 238, 374 *A.*2d 445 (1977). There the Court reversed adjudications of delinquency of four juveniles who had been determined to be juveniles in need of supervision (JINS), under a statute later replaced by the juvenile-family crisis provisions of the Code of Juvenile Justice. Each of the juveniles had been placed by the Family Part judge in a shelter care facility which he then left without permission. Each was charged with conduct alleged to constitute escape under the Title 2A criminal statute, *N.J.S.A.* 2A:104–6, and adjudicated delinquent.

Recognizing that the youngsters were "not free to come and go at will [and that] leaving such a facility without permission is contrary to the notion of parental supervision and control which shelter care is designed to provide," the Supreme Court nonetheless concluded that such conduct

is not in the category of a criminal escape. The unauthorized leaving of a shelter is symptomatic of the very problem for which shelter care is being provided. It would be incongruous to classify a juvenile as a delinquent for the same kind of conduct which under the Act constitutes him or her as being in need of supervision only.

[73 *N.J.* at 244–45, 374 *A.2d* 445.]

Although the Court was addressing "escape" and not "contempt" in *M.S.,* the incongruity described is analogous to the issue before us. The Court noted that the trial court and the Appellate Division (which affirmed the adjudications), had reasoned that "the 'escape' label ... was the only effective way to deal with a JINS who runs away from a shelter." *Id.* at 245, 374 *A.2d* 445. But the Court recognized two significant negative consequences plaintiff of such an approach:

> The difficulty with this approach is that while it solves the immediate problem by giving the court the right to resort to detention, it has at least two adverse consequences. *First, the juvenile, originally classified as in need of supervision only, is subject to institutionalization with delinquents,* many of whom have committed acts of violence and brutality. Such institutionalization exposes the JINS to the very influences which the Act seeks to avoid. *Second, the JINS is adjudicated a delinquent,* a term which "has come to involve only slightly less stigma than the term 'criminal' applied to adults." *In re Gault,* 387 *U.S.* 1, 24, 87 *S.Ct.* 1428, 1441, 18 *L.Ed.2d* 527, 544 (1967). *The after effects of labeling a child "delinquent" are particularly unfortunate for a JINS who is merely a runaway.*
> [73 *N.J.* at 245, 374 *A.2d* 445 (emphasis added).]

The Court recognized the disparity between the underlying offense—running away—and the final disposition, concluding that the solution lay in stricter supervision and control within the shelter, and not in adjudication of delinquency.

Another case that informs our decision is *State v. Williams,* 234 *N.J.Super.* 84, 560 *A.2d* 100 (App.Div.1989). There we held that an adult whose criminal conviction results in a probationary sentence with conditions and who later violates those conditions, cannot be prosecuted for criminal contempt of court under *N.J.S.A.* 2C:29–9. We noted the availability of *R.* 1:10 to address contempts of court, 234 *N.J.Super.* at 89 n. 2, 560 *A.2d* 100, and after parsing the language of the sentencing statute relating to probationary sentences, we said:

> We therefore draw a distinction between an order directed to a defendant or another to do or refrain from doing a particular act (the violation of which could be the basis of a contempt of court citation by a judge or indictment by a grand jury), and a conditional order which either states the ramifications of its violation or has such consequences established by law.
> [*Id.* at 91, 560 *A.2d* 100.]

Our rationale in *Williams,* equally applicable here, was that "[c]ontempt of court should not be superimposed as an additional remedy in a probation violation setting if the act that occasions the violation itself is not otherwise criminal." *Ibid.* Under the Criminal Code, a defendant who violates the conditions of his probationary sentence is subject to revocation of probation and resentencing for the crime of which he was originally convicted. The parallel in the juvenile-family crisis setting would be to bring the juvenile and her parents back before the Family Part and to reconsider the placement and conditions originally imposed, but not to charge her with criminal contempt of court for conduct that "itself is not otherwise criminal." *Ibid.*

We note another significant similarity between *Williams* and the case before us. The order here requires compliance with unspecified "rules of home" and "rules of school," without indicating the content of those rules. Likewise, the judgment of conviction in *Williams* required compliance with "conditions of probation," without specifying those conditions in the order itself. S.S. does not base her appeal on the issue of notice, and we did not explicitly base our decision in *Williams* on that issue. Nonetheless, we doubt that a conviction for criminal contempt of court can lie on such vague orders.

We recognize the judge's understandable concern that the court must have some means of enforcing orders involving juveniles who repeatedly run away from home or are chronically truant. Nonetheless, we are convinced that *N.J.S.A.* 2C:29–9 is not the appropriate or intended means of enforcement. On the basis of the Legislature's expressed goals, we are convinced that it was error to subject a status offender such as S.S. to an adjudication of delinquency based upon a repetition of the runaway conduct and truancy that brought her and her family to the court for help in the first place.

Our Juvenile Justice Code is a matter of state law that need not agree with the law of other jurisdictions, so long as it does not conflict with federal law. The Juvenile Justice and Delinquency

Prevention Act of 1974, as amended, 42 *U.S.C.A.* §§ 5601–5791b (JJDPA) does not address the question of bootstrapping raised by this appeal.[9]  The emphasis on prevention of delinquency in the JJDPA is, however, consistent with our reluctance to elevate repeated status offenses to delinquency.[10]

There is an obvious tension between the judiciary's power (and need) to enforce its own orders and its duty to provide appropriate protection for a juvenile—particularly one whose conduct has not violated any criminal law and has primarily endangered only herself. *See* Hughey, *supra*, 46 *Duke L.J.* at 361–62.  Other states have attempted to resolve that tension in various ways, both by statute and judicial decision-making.  *Id.* at 367–85.

Decisions we have examined from other jurisdictions reveal no clear consensus on the issue before us.  State courts in North Carolina and Pennsylvania have held substantially as we do today. *See In the Matter of Jones*, 59 *N.C.App.* 547, 297 *S.E.*2d 168, 169– 70 (1982) (reversing delinquency adjudication based upon status offender's violation of court order to attend school and keep

---

[9] Under the Act, any state applying for and accepting federal funds for a juvenile justice program is prohibited from confining a status offender to a secure detention or correctional facility where adjudicated delinquents, or juveniles accused of criminal conduct that could result in an adjudication of delinquency, are housed.  42 *U.S.C.A.* § 5633(a)(11)(A) and (B).  Thus most states have enacted statutes similar to *N.J.S.A.* 2A:4A–88, prohibiting such institutionalization.

[10] *See, e.g.,* 42 *U.S.C.A.* § 5601(a)(10):

These problems should be addressed through a 2–track common sense approach that addresses the needs of individual juveniles and society at large by promoting—

(A) quality prevention programs that—

(i) work with juveniles, their families, local public agencies, and community-based organizations, and take into consideration such factors as whether or not juveniles have been the victims of family violence (including child abuse and neglect); and

(ii) are designed to reduce risks and develop competencies in at-risk juveniles that will prevent, and reduce the rate of, violent delinquent behavior.

regular hours); *In the Interest of Tasseing H.*, 281 *Pa.Super.* 400, 422 *A.*2d 530, 535 (1980) (reversing status offenders' adjudication of delinquency for contempt, and confinement to detention facility for delinquents, based upon running away from shelter care previously ordered by the court).

Courts in Alaska, Florida, Hawaii, and Minnesota have upheld an adjudication of delinquency in similar circumstances. *See In the Matter of L.A.M. v. State*, 547 *P.*2d 827, 832 (Alaska 1976) (affirming adjudication of delinquency under criminal contempt statute when juvenile in need of supervision, based upon chronic truancy, disobeyed a court order prohibiting her from running away from foster home); *G.S. v. State*, 709 *So.*2d 122, 123 (Fla. Dist.Ct.App.1998) (denying habeas petition and holding that courts have the authority to issue a contempt sanction against a juvenile for violating a community control order); *In the Interest of Doe*, 96 *Hawai'i* 73, 26 *P.*3d 562, 571 (2001) (affirming adjudication of delinquency for criminal contempt where chronic truancy had placed the juvenile under protective supervision and juvenile subsequently violated conditions of court order of supervision); *State ex rel. L.E.A. v. Hammergren*, 294 *N.W.*2d 705, 707–08 (Minn.1980) (affirming dismissal of habeas petition, recognizing juvenile court's authority to find a juvenile in contempt of court, but cautioning that status offender normally should be placed in a shelter care facility, and only egregious circumstances warranted confinement of status offender in secure detention facility).

In *State in the Interest of J.S., supra*, the Family Part judge held that "a status offender involved in crisis intervention" who violated a court-ordered curfew committed a criminal contempt of court which would "effectively elevate the juvenile to the status of a delinquent." 266 *N.J.Super.* at 424, 629 *A.*2d 1371. As explained above in this opinion, we disagree with the rationales expressed in *J.S.* that such an approach is either in the best interest of the juvenile or consistent with the Code of Juvenile Justice. *Id.* at 428, 629 *A.*2d 1371.

The adjudication of S.S. as a delinquent is reversed. The matter is remanded for correction of S.S.'s juvenile record.

Reversed and remanded.